## In re PEJEPSCOT PAPER CO.

District Court, D. Maine, S. D.
April 5, 1938.

Bradley, Linnell, Nulty & Brown, of Portland, Me., for petitioners.

Clement F. Robinson, of Portland, Me., for trustee.

PETERS, District Judge.

The petitioners, Price & Pierce, Limited, were, at the date of the filing of the debtor's petition, and had been for some time, sellers of sulphite pulp to the debtor. They now ask the court to be permitted to reclaim certain of the pulp, on the ground (1) that there has never been a delivery sufficient to pass title, (2) that, if title passed, it was under circumstances which invalidated the transaction and entitled the sellers to reclaim the goods.

The case was submitted on stipulated facts, including certain exhibits from which it appears, in substance, that the sellers had written contracts with the debtor, dated in 1936, calling for monthly shipments of pulp from abroad to be delivered at Brunswick, Me., with the option on the part of the sellers to make delivery at any other "port." Brunswick not being a port, the shipments were delivered on the dock at Portland. The price was "ex dock Portland." The shipment in question, valued at $5,400, arrived in Portland on June 29, 1937, and was placed in the warehouse of the Portland Terminal Company, for storage, by agents of the sellers, from which place, according to the usual procedure, it would be taken by the buyer when desired.

On June 30th agents of the sellers notified the Portland Terminal Company in writing that the pulp was to be held subject to the order of the buyer, using this language:

"We note that these two lots are for the Pejepscot Paper Company and it will be in order to honor their direct instructions."

Invoices covering this shipment were received by the buyer July 1st. The buyer was not informed of the order given the warehouse company above mentioned, but, from the usual course of dealing, it might well have supposed that the pulp was then, or was about to be, "placed on the wharf of the Portland Terminal Company, whence, at the convenience of the buyer thereafter, and at its expense, said pulp would be transported to Brunswick," according to the agreed statement.

There were no further communications until July 9th when the buyer's agent telephoned the terminal company to carry out such instructions as to the pulp on the wharf as the buyer's counsel should give. On the same day the buyer's counsel sent a note to the terminal company confirming the telephone conversation and the understanding that the pulp was only to be delivered on his orders, and saying that he would give further instructions on or before the 12th. On the 9th also the agent of terminal company confirmed with his signature the understanding that the pulp was then held subject to the orders of counsel. As the agent had an unrevoked authority from the sellers to so act, it would seem that the title to the goods then, on July 9th, definitely passed to the buyer.

The Sales Act of Maine, Rev.St.1930, c. 165, § 18, which governs the transaction, provides that the title to goods sold passes at such time as the parties intend it to pass, and that in ascertaining their intention, "regard shall be had to the terms of the contract, the conduct of the parties, usages of trade and the circumstances of the case." Having regard to all those things mentioned, and taking into consideraion all the terms of the contracts covering the sale, I can see no other conclusion than that the sale was completed and the title passed at Portland on July 9th; and so hold.

■ It follows that the petitioners cannot be permitted to repossess the property on the ground that title never passed. The right to stop in transitu expired upon delivery.

It remains to consider the claim that the sellers should be permitted to repossess the goods on the ground that delivery was obtained by what amounted to fraud or deceit. The record in the proceedings is before the court. From that it appears that the directors of the debtor corporation, at a meeting in New York City on July 8th, authorized the execution and filing of the petition for reorganization under section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207, that the petition and accompanying papers, which had been previously prepared, were filed in court July 10th, and approved the same day.

■ It goes without saying that if the sellers of the pulp in question had known on July 8th or 9th that such a petition had been authorized, they would have revoked the authority given the warehouseman to attorn to the buyer, or taken such other action as might be necessary to protect their rights under the law and under their contract which contained a special provision to the effect that if at any time the buyer's financial responsibility should become impaired or unsatisfactory to the sellers, they could require cash or security for the sale price, or refuse to make further shipments or deliveries. So this is not the somewhat usual case of fraud of an insolvent where he obtains goods with no intention to pay, the contract of sale being thereby invalidated. There is no intentional fraud shown here on the part of any officer, agent, or attorney of the debtor corporation. Also, the contracts of sale were made in 1936, when it was quite proper and reasonable for the corporation to buy goods and expect to pay. A contract cannot be rescinded for fraud where the false representations were made subsequently and merely induced a party to perform a previously existing, complete, valid contract. Remington on Bankruptcy, 4th Ed., par. 2456; In re Forsythe Shoe Corp., D.C., 3 F.Supp. 328. These contracts provided that each shipment should be a separate contract, and it should be noted that the contract was not for unconditional delivery, but contained the provision above referred to whereby the sellers reserved the right to refuse to deliver the goods if the buyer's financial responsibility became impaired or unsatisfactory to the sellers.

■ Under these circumstances a false representation as to solvency, made just before delivery, could easily avoid the sale. There was no representation made, either true or false, but there was a concealment of a serious impairment of credit and a taking of delivery contrary to the real meaning of the contract and the intention of the parties, which was in substance that the buyer should not have the goods and leave the sellers with an unsecured account, unless the sale continued to be at least a business risk. This was the equivalent of a false representation, and should have the same effect. Against their will and contrary to the terms of a carefully drawn contract, the sellers have suffered the loss of their goods and will have to take their chances in a hoped-for reorganization proceeding that has already dragged along nine months and shows few signs of producing anything, if the position of the buyer is sustained.

It would be wholly inequitable and against good conscience to take the sellers' goods and use them in the operation of the debtor's business (now being carried on under the direction of court) under the circumstances here disclosed.

The following is quoted from the opinion in Marion Mach. Foundry & Supply Co. v. Girand et al., 5 Cir., 285 F. 160, 161: "It is not claimed that actual fraud was shown, but petitioner contends that it is entitled to the money held in lieu of the rig irons, because the sale was made only upon condition, which was never performed. We are of opinion that the contention is well founded. It is not necessary to show actual fraud. It is sufficient if in equity and good conscience the proceeds of the sale of the rig irons ought to be paid over to the petitioner. In re American Knit Goods Mfg. Co. [2 Cir.] 173 F. 480, 97 C.C.A. 486; In re New York Commercial Co. [2 Cir.] 228 F. 120, 142 C.C.A. 526; Ramey v. Allison, 64 Tex. 697. The case is not affected by the fact that the petitioner accepted a check which was not paid. In re Perpall [2 Cir.] 256 F. 758, 168 C.C.A. 104."

Accordingly, the prayer of the petition is granted and the goods ordered returned to the petitioners Price & Pierce, Limited.